**Michael A. NEMIR, Plaintiff,**

v.

**MITSUBISHI MOTOR SALES OF AMERICA and Chrysler Corp., Defendants.**

No. 96–75380.

United States District Court,
E.D. Michigan,
Southern Division.

July 30, 1999.

George A. Hilborn, Eric A. Buikema, Hilborn & Hilborn, PC, Birmingham, MI, Craig E. Schaefer, Leland, for Plaintiff.

David R. Kelly, Thomas P. Branigan, Fred J. Fresard, Bowman & Brooke, Detroit, MI, Craig L. John, Dykema Gossett PLLC, Bloomfield Hills, MI, for Defendants.

### OPINION AND ORDER

FEIKENS, District Judge.

## I. INTRODUCTION

In this products liability case, plaintiff Michael Nemir, a medical doctor, makes several allegations regarding a seatbelt and its operation. He says that he believes he fully latched his seatbelt in his

Dodge Stealth automobile when he began a trip that resulted in serious injuries to himself. He says that the seatbelt became partially latched prior to the accident, and that due to the impact of the accident, he was thrown into the back seat of the Stealth.

To explain how this could have happened, he retained an expert who conducted tests to demonstrate that Dr. Nemir's seatbelt could have been in a "partially latched" position. It is this testing, and the manner in which it was conducted, that is the crux of this case.

## II. BACKGROUND

On December 14, 1993, Dr. Michael Nemir was driving his 1991 Dodge Stealth near Clear Springs, Maryland. While traveling southbound on a two-lane road, Dr. Nemir lost control of the Stealth. The rear-end of the vehicle swung out to the right and the vehicle left the roadway. The right-front quarter panel of the Stealth impacted a fence post or small tree; then the right side of the vehicle severely impacted a larger tree. Dr. Nemir, who believes that he fully latched his seatbelt prior to departure, was thrown from the driver's seat into the back seat of the Stealth. His head struck the "B" pillar in the right rear of the vehicle and he suffered severe injuries.

When paramedics arrived, they found Dr. Nemir lying in the back seat, unresponsive, with irregular respirations and no pulse. He was resuscitated and hospitalized. He has made some recovery, but continues to suffer from severe motor dysfunction, cognitive disability and partial blindness. Unfortunately, his career as a pediatric physician is ended.

In November, 1996, Dr. Nemir filed suit against Mitsubishi Motor Corporation and Chrysler Corporation.[1] He does not allege that the seatbelt buckle was defectively manufactured. He alleges that the seatbelt buckle was defectively designed in that it allows a condition known as "partial latching," a condition in which the seatbelt appears to be fully latched but is in fact not fully latched, and will not restrain the occupant in the event of a crash. He contends that his seatbelt was in fact "partially latched" prior to his accident, and that its failure to restrain him either caused or exacerbated his injuries. He also alleges that the dashboard seatbelt light in the Dodge Stealth should have functioned to warn him that his seatbelt was not properly latched, and that defendants' "failure to warn" him of this condition also caused or exacerbated his injuries.

Defendants have filed summary judgment motions as to the design defect and the failure to warn claims. In their motion as to the design defect claim, they raise two arguments. First, they contend that plaintiff's expert testimony as to an alleged design defect is inadmissible under Federal Rule of Evidence (FRE) 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Without such expert testimony, defendants argue, plaintiff cannot produce evidence to support his theory of a design defect. Second, defendants contend that plaintiff cannot produce suffi-

---

1. The original complaint in this case also named Mitsubishi Motor Sales of America, MMC Services, Inc., MMC U.S.A. Corp, Takata, Inc., T K Holdings Inc., Takata Corp., Takata North American, Inc., Irvin Automotive Products, Inc., Irvin Industries, Inc., Irvin Automotive Industries, Inc., Halle & Stieglitz, Inc., Irvin Industries, Inc., N.Y., and Irvin Industries, Inc., Michigan as defendants. In an order of August 28, 1997, these defendants were dismissed with prejudice.

In addition, the complaint alleged that Dr. Nemir's injuries had been caused or exacer-

bated by several defects in the Stealth, including uncrashworthiness, the vehicle's propensity to yaw (that is, the propensity of the rear-end of the vehicle to swing around the front of the vehicle), failure of the driver's-side airbag to deploy, failure of the seatbelt to restrain and failure to warn Dr. Nemir as to any or all of these defects. Plaintiff voluntarily dismissed all claims except the seatbelt design defect claim and the related failure to warn claim.

cient evidence meet the "risk/utility" analysis required in a design defect claim under Maryland law.

As to the failure to warn claim, defendants raise two arguments. First, defendants contend that plaintiff's expert is not qualified to testify as to the adequacy of the warnings given. Second, they contend that plaintiff has not presented evidence of causation—that is, plaintiff has not demonstrated that the warning he alleges is necessary would have prevented his injuries.

Thus before me are three issues: First, because plaintiff relies on expert testimony to support his claims, I must consider whether plaintiff's proffered expert testimony is admissible under FRE 702 and *Daubert*. Second: choice of law—defendants contend that Michigan law should apply while plaintiff argues that Maryland law should apply. Third: whether plaintiff can produce admissible evidence as to the elements of the design defect claim. This requires (if Maryland law applies) that I determine whether plaintiff can demonstrate a triable issue of fact as to (1) a design defect condition, and (2) the unreasonably dangerous condition of the product. This also requires that I determine (a) whether the product poses an inherently unreasonable risk, or (b) whether plaintiff can demonstrate a triable issue of fact based on Maryland's risk-utility law. And I must address plaintiff's failure to warn claim.

## III. PLAINTIFF'S DESIGN DEFECT CLAIM AND HIS PROPOSED EXPERT TESTIMONY

### A. The Alleged Design Defect—"Partial Latching"

Plaintiff's Dodge Stealth was equipped with Takata 52 (TK52) series seatbelt buckles. Plaintiff alleges that the TK52 series buckles are defectively designed. The routine steps involved in the use of a seatbelt are important. A seatbelt buckle, in order to be effective, must be fastened. When a user fastens a seatbelt, he/she inserts the latchplate (the metal "male end" of the seatbelt) into the buckle mech-

anism (the "female end" of the seatbelt anchored to the floor at the center of the vehicle). (See Appendix A) As the latchplate is inserted, but before it actually latches, the latchplate pushes against an "ejector spring" (or other similar device). The ejector spring compresses, and exerts a small amount of force in the direction which would tend to push the as yet unlatched latchplate out of the buckle mechanism. If the user stops inserting the latchplate into the buckle mechanism and lets go of the seatbelt prior to the point at which the two parts of the buckle lock together, the ejector spring pushes the latchplate out of the buckle mechanism and the belt retractor system pulls the seatbelt back into the frame of the car. If, as commonly occurs, the user inserts the latchplate completely into the buckle mechanism of the buckle, the buckle latches and a click is heard. Such a properly latched buckle can withstand several thousand pounds of force before separating, (Horton Dep. p. 91), and the user must press the release button in order to unlatch and remove the belt. When the release button is depressed, the buckle unlocks, the ejector spring pushes or "pops" the latchplate out of the buckle mechanism, and the belt retractor system pulls the seatbelt into a stowed position.

According to plaintiff's expert Thomas Horton, TK52 series buckles, including the subject buckle in Dr. Nemir's Stealth, may in use have a "third" position, "partial latch." In this condition of partial latch, the interior mechanisms of the buckle engage only slightly—enough to hold the latchplate in the buckle notwithstanding the counter-force of the ejector spring and retractor system. The interior mechanisms do not fully engage, and the buckle will therefore unlatch or separate without depressing the release button and with a minimal amount of force, much less than several thousand pounds that it would take to separate a fully locked seatbelt buckle. Plaintiff alleges that "partial latch" gives the user the impression that the buckle is fully latched because the latchplate does

not "pop out" of the buckle, but such a partially latched buckle does not provide proper restraint in the event of an accident.

### B. Federal Motor Vehicle Safety Standard (FMVSS) 209

Plaintiff notes that partial latching is referred to in FMVSS 209, codified at 49 C.F.R. § 571.209. Specifically, subsection 5.2(g) refers to a condition called "partial engagement":

> A metal-to-metal buckle shall be examined to determine whether partial engagement is possible by means of any technique representative of actual use. If partial engagement is possible, the maximum force of separation when in such partial engagement shall be determined.

Section 571.209 S4.3(g) also provides:

> "[A] metal-to-metal buckle shall separate when in any position of partial engagement by a force of not more than [five pounds]." [2]

Plaintiff's theory of the design defect, as stated by his expert, tracks the standard set forth in these subsections:

> [Defense Counsel Kelly (to Horton)]: You believe there is a design defect?
>
> [Horton]: Yes.
>
> . . . .
>
> [Kelly]: And what is that defect?
>
> [Horton]: **That it will partial** [sic] **engage and take more than a reasonable amount of poundage to pull it out of partial engagement.**

(Horton Dep. p. 134).

### C. Horton's Tests

To support his theory of design defect, Horton conducted testing on several exemplar TK52 series buckles. Unfortunately, Horton did not record the details of this testing except to write down the results obtained. His video deposition testimony and a demonstration video submitted in response to defendants' motion sets forth the manner in which Horton conducted his testing.

Horton obtained seven TK52 series buckles from salvage yards and prior clients. For his testing, Horton used the buckle mechanism of six of the buckles and the latchplate of the seventh.[3] As a preliminary step, he took three measurements of each of the six latchplates corresponding to each of the six buckle mechanisms. He also measured those same three dimensions on the exemplar latchplate, in order to demonstrate that the exemplar latchplate that would be used in his testing procedure was substantially identical to the latchplates that corresponded to each of the six exemplar buckle mechanisms.

Horton then proceeded in a manner designed to emulate testing under FMVSS 209. For each of the six buckle mechanisms, Horton clamped the buckle mechanism to a desktop. After "cycling" the

---

**2.** Effective May 27, 1999, the unit of force used in subsection S4.3(g) has been changed to newtons (N). A newton is "the unit of force in the mks [meter-kilogram-second] system of physical units that is of such size that under its influence a body whose mass is one kilogram would experience an acceleration of one meter per second per second." *Webster's Third New International Dictionary*, (1986). A force of five pounds is equivalent to approximately 22 N.

This requirement of subsection S4.3—that a partially engaged buckle ought to separate with a minimal amount of force, less than five pounds—may seem counterintuitive. Because the risk involved in a partially engaged buckle is that it will not restrain the user in a crash, it might appear that a partially latched buckle ought to be designed to separate only with a maximum amount of force (several thousand pounds) rather than a minimal amount of force. The rationale for the FMVSS 209 standard as it exists, however, is that a partially latched buckle should, given the ejector spring, the retractor system, and any movements of the user, "pop out" during ordinary use, and thus "inform" the user that the seatbelt was not properly latched in the first instance.

**3.** The six buckle mechanisms were taken from a 1989 Geo Metro, a 1993 Suzuki Sidekick, two 1994 Isuzu Rodeos (from which a total of three buckles were removed), and a 1993 Geo Storm. The latchplate used in the testing was removed from a 1991 Subaru Justy.

buckle mechanism at least ten times (by fully latching and unlatching the exemplar buckle and the latchplate), Horton placed each buckle into what he considered to be a condition of partial latch. This was done by one of two methods.

The first is referred to as the insertion method. In this method, Horton slowly inserts the latchplate into the buckle mechanism. In the video demonstration and video deposition, this method often included rocking the latchplate back and forth in the buckle mechanism as it was inserted. As the buckle nears the point of engagement (where the latch inside the buckle would swing down and lock the latchplate in the buckle mechanism), Horton can be observed carefully easing the latchplate into position. In some tests, Horton can get the latchplate to "stick" in a position in which the latch has started to engage the latchplate, but has not actually dropped through the hole in the latchplate and locked the buckle. When Horton stops inserting the latchplate at just the right point, less than a millimeter from full engagement, (Horton Dep. p. 192), the buckle will remain in what Horton considers to be a position of partial latch. To demonstrate that the buckle is partially latched, Horton does one of two things: He either pulls the latchplate out of the buckle with a comparatively small amount of force (and without depressing the release button) or he pushes the latchplate fully into the buckle with his index finger. If an audible "click" can be heard (the sound of the latch dropping through the hole in the latchplate), he claims the buckle was partially latched prior to the click.

His other method is the "push-button method." In order to put a TK52 series buckle into partial latch using this method, Horton first fully inserts the latchplate into the buckle mechanism so that the buckle is locked. Then, while holding the buckle mechanism in one hand, he places his index finger of that hand on the release button of the buckle, and puts his other hand on the latchplate. Holding the latchplate in position with his second hand (so that the ejector spring cannot eject the latchplate), he pushes the release button down slightly and allows the latchplate to come out of the buckle mechanism a fraction of a millimeter. With the latchplate now in place, he takes his finger off of the release button and his other hand off the latchplate, and he claims that the buckle is now in partial latch. To demonstrate his point he either pulls the latchplate out of the buckle mechanism or he simply pushes on the latchplate with his index finger—a "click" is heard and the buckle is fully latched.

Using both these methods, he proceeded with his testing. After each buckle was placed into a partially latched position, Horton hooked a force gauge (an electronic instrument designed to record the maximum amount force applied) to the latchplate and pulled on the latchplate until it separated from the buckle mechanism. As the latchplate is removed from the buckle mechanism, Horton records the amount of force that had been required to pull the latchplate from the buckle mechanism. In those few instances in which Horton could not pull the latchplate from the buckle mechanism, despite pulling on the latchplate (but as to which he later confirmed that the buckle had been partially latched by pressing on the latchplate so that a "click" was heard), he recorded the maximum amount of force generated.

Horton's deposition testimony reveals that he began testing the first exemplar buckle using the insertion method as described above. On the first trial, Horton inserted the buckle to a position of partial latch, then separated the buckle. He recorded the force required: 1.85 pounds. Horton repeated the steps, again using the insertion method, recording a result of 3.20 pounds. Horton partially latched the buckle a third time by insertion and recorded a result of 2.05 pounds. Each of these results was obtained using the insertion method. (Horton Dep. p. 77). I note that these minimal forces are well within

the five pounds of force stated in FMVSS 209.

Horton described what happened next:

What I then did, I realized it was partial latching at a *very light point.* This latch can assume many different positions of partial engagement. I then took the cover off because this particular buckle I've removed the cover in the past so that we can use it as a demonstrative exhibit during depositions to show the parts and then I, with the cover off I put it into a partial engagement position where I could actually watch the mechanism and it would assume a deeper latch point at that point and then I pulled it two more times doing that method and that's where I got the 31.5 and the 26.15 pounds with the sample.

(Horton Dep. pp. 78–79 (emphasis added)). The video deposition immediately following the above testimony reveals that Horton used the push-button method, rather than the insertion method, to obtain the 31.5 pounds and 26.15 pounds results.

Horton proceeded to test the second exemplar seatbelt using the push-button method. (Horton Dep. p. 90), and obtained six results (in pounds): 2.50, 24.80, 5.30, 28.55, 37.65 and 29.50. After the second exemplar buckle, he could not specifically recall the method used for subsequent tests. (Horton Dep. p. 99–101). The results are listed below (all in pounds):

| | |
|---|---|
| Buckle Three (listed as Sample 4): | 4.40, 23.10, 13.55, 21.05, 17.40, 5.55 |
| Buckle Four (listed as Sample 5): | 21.60, 12.10, 24.75, 24.40, 23.50, 17.85, 27.80, 36.35, 40.00, 49.55 |
| Buckle Five (listed as Sample 6): | 7.60, 11.50, 21.55, 30.80, 8.10, 9.75, 13.30, 26.55, 34.00 |
| Buckle Six (listed as Sample 7): | 11.15, 22.60, 17.80, 6.85, 8.70, 9 .65, 17.55, 28.85, 9.80, 34.60 |

In sum, Horton ran forty-six tests on the six exemplar buckles. On two buckles (four and six), he ran the test ten times; on the first buckle, he ran the test only five times. Of the three tests in which Horton could recall having used the insertion method (all with buckle one), none of the tests required more than five pounds

to separate the buckle from the latch. Once Horton began to employ the push-button method, forty-one out of the remaining forty-three tests required more than five pounds to separate the buckle from the latch.

Defendants argue that the results of these tests, as well as Horton's opinions based on these tests, are inadmissible under *Daubert.* Defendants contend that plaintiff fails to present any evidence demonstrating that partial latching actually occurred in this case. They also contend that Horton's tests are unreliable for a variety of reasons, including but not limited to: the use of the insertion and push-button methods; use of buckles from salvage yards; use of one latchplate and several buckle mechanisms; and failure to record the details of the tests. It is to the *Daubert* issue that I now turn.

## IV. *DAUBERT*

Federal Rule of Evidence 702 states the standard for admissibility of expert testimony:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court held that FRE 702 requires that trial judges perform a "gatekeeping role" when considering the admissibility of expert testimony. *Id.,* at 597, 113 S.Ct. 2786. *Daubert* and FRE 702 "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id. Daubert* suggests several factors that trial judges can consider in determining the reliability of proffered testimony: (1) whether the proposed hypothesis is testable, (2) wheth-

er the theory or technique has been subject to peer review or publication, (3) the known or potential error rate, and (4) whether the theory or technique is "generally accepted." *Id.*, at 593–4, 113 S.Ct. 2786. These suggested factors are not presented as a "definitive checklist," *id.*, at 593, 113 S.Ct. 2786, but are offered to assist trial judges in their "flexible" inquiry as to the reliability of expert testimony. *Id.*, at 594, 113 S.Ct. 2786.

Recently, in *Kumho Tire Company v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court reiterated *Daubert*'s central holding that trial judges must perform a gatekeeping role as to all proffered expert testimony. *Id.*, 119 S.Ct. at 1174. *Kumho* held that trial courts may consider the specific *Daubert* factors in assessing the reliability of all types of expert testimony, including both "scientific" and "technical" evidence.[4] *Id.*, 119 S.Ct. at 1174–6. The Court emphasized that the *Daubert* factors remain "helpful," rather than "definitive," and in no case are trial judges obligated to apply *Daubert* as a formalistic checklist. "[W]hether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.*, 119 S.Ct. at 1176.

As a gatekeeper, I am required to decide whether Horton's expert opinions, and the basis for those opinions, are reliable and relevant. I conclude that Horton's testing and opinions are neither reliable nor relevant.

## A. Relevance or "Fit"

The Supreme Court described the relevance requirement in *Daubert*:

[FRE 702]... requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." This condition goes primarily to relevance. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." 3 Weinstein & Berger ¶ 702[02], p. 702–18. See also *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir.1985) ("An additional consideration under Rule 702—and another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.")

*Daubert*, 509 U.S. at 591, 113 S.Ct. 2786 (emphasis added). See also *United States v. Bonds*, 12 F.3d 540, 557 (6th Cir.1993) (citing *Daubert* for the proposition that expert testimony must be "sufficiently tied to the facts of the case" in order to be admissible.)

Against defendants' motions plaintiff relies entirely upon Horton's testimony as to the nature of "partial latching," and his testing of the TK52 series buckle. Because of the relevance prong of *Daubert*, plaintiff must demonstrate that Horton's "insertion" and "push-button" methods are sufficiently tied to the manner in which plaintiff used the subject seatbelt buckle on December 14, 1993. Plaintiff must demonstrate that the methods used by Horton to achieve partial latching in his testing are "representative of actual use." 49 C.F.R. § 571.209 S5.2(g).[5] Absent evi-

---

4. *Kumho* thus modifies *United States v. Jones*, 107 F.3d 1147, 1158 (6th Cir.1997) (holding that "*Daubert* does not create a new framework for analyzing proffered expert testimony based upon 'technical or other specialized knowledge.'") *Jones* did recognize, however, that *Daubert*'s language relative to the gatekeeper function is applicable to all expert testimony offered under FRE 702, *id.*, at 1156, a recognition entirely consistent with *Kumho*. See also *Berry v. City of Detroit*, 25 F.3d 1342, 1350 (6th Cir.1994).

5. Not surprisingly, *Daubert*'s fit requirement coincides with the requirement contained in FMVSS 209 that testing for partial latch be "*by means of any technique representative of actual use.*" (emphasis added). Just as *Daubert*'s "fit" requirement seeks to ensure that a jury is presented expert evidence only when that evidence is demonstrably germane to the facts of the case, so too does FMVSS 209 seek also to focus testing of seatbelts on those situations which might arise in actual use.

dence relating Horton's methods of achieving partial latching to the events of December 14, 1993, or to actual use of seatbelts generally, Horton's tests and his testimony as to partial latching would not assist the jury in deciding the facts.

■ Horton's methods are not "representative of actual use" of a seatbelt, and plaintiff has produced no evidence "tying" Horton's methods to the facts of this case. Both Horton's methods used to achieve partial latch involve Horton's purposeful, even painstaking, manipulation of the buckle. Obviously, actual users of seatbelts do not undertake such efforts to achieve partial latch.

Horton, whose expertise does not extend beyond seatbelt design and testing, attempts to explain this difficulty by suggesting that a person *"could,"* while seated in a vehicle, duplicate his methods by inadvertence—either by accidentally failing to insert the latchplate all the way into the buckle mechanism, or by accidentally partially depressing the release button.[6]

His suggestion is sheer speculation. Indeed, Horton's inadvertence hypothesis assumes the very "fit" that *Daubert* requires be shown. Plaintiff provides no evidence to support the assertion that Horton's methods can be duplicated by inadvertence. "[A]bsent creditable grounds supporting such a link" between Horton's methods and actual inadvertent misuse of a seatbelt, evidence that the TK52 series buckle can be partially latched by Horton (and that the buckle can be partially latched in such a manner as to require more than five pounds to separate) "will

not assist the trier of fact in determining" either whether the TK52 series buckle is susceptible to inadvertent partial latching or whether the buckle was in fact inadvertently partially latched on December 14, 1993. *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786.

It strains credulity to suggest that his machinations, involving careful manipulation of the buckle, can be approximated by inadvertence.

In the hours of video deposition and during Horton's video demonstration, Horton places TK52 series buckles into what he claims is partial latch countless times by the push-button method. Not once did I observe him successfully put the buckle into partial latch without the use of both hands. Careful attention reveals that invariably Horton held the latchplate in the buckle with one hand while working the button with the other hand in order to achieve partial latch.[7] In the several instances in which Horton attempted to partially latch a TK52 series buckle without holding the buckle together while he depressed the release button, the ejector spring "popped" the latchplate out of the buckle mechanism (even without the benefit of the belt retractor system). Even in those attempts, Horton is clearly cautiously depressing the release button in an effort to, as he phrases it, get the buckle to "hang up."

Much less often, Horton can be observed attempting to place a TK52 series buckle into partial latch by the insertion method. This method likewise involves some difficulty. Horton often inserted the latch-

---

6. Interestingly, considering Horton's inadvertent-depressing theory, Horton was not critical of the design of the push-button itself:

 [Defense Counsel Kelly (to Horton)]: Are you critical of the design of the push button in terms of its accessibility or the possibility of pushing on it inadvertently or unintentionally?

 [Horton]: No, I don't. It's not a bad design from that point of view. You don't want them sticking up out of the cover, for example.

 (Horton Dep. p. 161).

7. Horton testified that it is not necessary for him to hold the latchplate in the buckle mechanism while he depressed the push button when attempting to achieve partial latch by the "push-button" method. (Horton Dep. p. 187). Whether or not Horton's method requires one hand or two, it is readily apparent from Horton's videos that achieving partial latch requires a fair amount of care on Horton's part. Indeed, quite often during the video Horton failed to place a TK52 series buckle into a position of partial latch even when he was trying to do so with both hands.

plate at as sharp an angle as the opening of the buckle mechanism would allow, and frequently "rocked" the latchplate back and forth as he worked it into position. At a point less than a millimeter from full insertion, Horton stopped inserting the latchplate, and then stated that the buckle was partially latched. He then demonstrated that the buckle would fully latch with the slightest pressure from his index finger.

While plaintiff is entitled to every reasonable inference, I "need not accept as true ... unwarranted factual inferences." *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 400 (6th Cir.1997) (quoting *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir.1987)). Absent some evidence to the contrary, plaintiff's proposed nexus between Horton's methods and inadvertent misuse of the buckle is precisely that sort of "unwarranted factual inference." Having reviewed the video deposition and demonstration repeatedly, I conclude that Horton's deliberate methods are not relevant to the issue whether partial latching can occur inadvertently or whether it occurred inadvertently in this case.

> "The analytical gap between the evidence presented and the inferences to be drawn...is too wide. Under such circumstances, a jury should not be asked to speculate on issues of causation."

*Kalamazoo River Study Group v. Rockwell International Corp.*, 171 F.3d 1065, 1073 (quoting *Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d 1349, 1360–61 (6th Cir.1992)).

Horton's expert testimony, based upon his "insertion" and "push-button methods," is inadmissible under the relevance prong of the *Daubert* analysis.

## B. Reliability

■ Horton's hypothesis also fails to meet the reliability prong of the *Daubert* framework.[8] Among the factors I may consider in assessing the reliability of Horton's proffered testimony are (1) whether the proposed hypothesis is testable, (2) whether theory or technique has been subject to peer review or publication, (3) the known or potential error rate, and (4) whether the theory or technique is "generally accepted." Before addressing each of these factors, however, a general observation must be made regarding the reliability of Horton's tests.

Horton did not record all of his testing procedures; he recorded only the numerical results of his tests. The sole source of information as to the manner in which he conducted the tests of the exemplar buckles is his own after-the-fact account of what occurred. The accuracy of that account relies in turn upon Horton's ability to recall precisely what occurred during the tests. His recollection is, for whatever reason, incomplete as to at least one issue.

As noted, Horton's deposition testimony reveals that he began testing the first exemplar buckle using the insertion method. He used the insertion test for each of the first three results, and each time, he obtained a result less than five pounds. He then switched to the push-button method, and only then did he obtain results greater than five pounds, consistent with his theory of partial latch.

Notwithstanding this obvious disparity between the insertion method and the push-button method, Horton failed to note the method he used for any subsequent trials. Deposition testimony indicates that Horton recalled using the push-button method for the second exemplar buckle mechanism, (Horton Dep. p. 90), but after the second exemplar buckle, he could not specifically recall the method used for subsequent tests. (Horton Dep. pp. 99–101).

Two conclusions are obvious: First, assuming Horton's insertion method is relevant as representative of actual use and was otherwise admissible, the results of his

---

**8.** Of course, it is only necessary to determine that proffered expert testimony fails either the relevance prong or the reliability prong in order to conclude that the testimony should not be admitted.

tests indicate that the TK52 series buckle, when partially engaged by the insertion method, is *not* defectively designed,[9] and the buckle does not violate FMVSS 209 S4.3(g).[10] In the three tests in which Horton could recall using the insertion method, the results were well within the five pounds allowed under FMVSS 209. It is only when Horton began using the push-button method that he began obtaining results consistent with his theory of design defect.

Second, the deposition testimony quoted above contains a candid admission by Horton that he conducted the tests in a manner calculated to achieve the desired results. After realizing that he was not obtaining results that would support his theory of a design defect, not only did he switch from the insertion method to the push-button method, but he removed the cover from the first buckle so that he could visually confirm that he was setting the buckle mechanism in a position of partial latch that would produce results above five pounds. While such actions may not have been done in bad faith, they undermine the reliability of Horton's results.

As to each of the four *Daubert* factors, I conclude:

### 1. Testability

"Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." *Daubert,* 509 U.S. at 593, 113 S.Ct. 2786. "For scientists, a new idea or explanation is not valid unless there is the possibility. that empirical testing can prove it false and until it has withstood thoughtful efforts at falsification." Bert Black, Francisco J. Ayala & Carol Saffran–Brinks, *Science and the Law in the Wake of* Daubert: A *New Search for Scientific Knowledge,* 72 Texas L.Rev. 715, 753–4 (1994). .

Horton hypothesizes that plaintiff's seat-belt buckle was partially latched at the time of the accident. Defendants note that there is no physical evidence that his seat-belt was partially latched. In response, Horton explains that "there's no physical evidence that you would have [of partial latching]." (Horton Dep. at 161). That is, he draws support for his partially latching theory from the very fact that there is no evidence that it occurred. If partial latching is to be demonstrated by a *lack* of evidence, however, there is no possibility that empirical testing can prove the hypothesis false.

A simple example illustrates the difficulty in Horton's reasoning:

> Consider the hypothesis that apples are made of iron, from which we derive the prediction that they should fall to the ground when cut off a tree. Apples do in fact fall when cut off, but it would be wrong to conclude that we have verified they are made of iron. In fact, if we conduct another experiment, based on the prediction that iron apples will sink in water, our hypothesis will quickly be falsified when the apples float.

Black, Ayala & Saffran–Brinks, *supra,* at 756. Inserting the facts of this case into the example: Consider Horton's hypothesis that plaintiff's buckle was partially latched, from which he predicts that there would be no physical evidence of damage or undue wear to the buckle. There is, in fact, no physical evidence of any damage or undue wear to the buckle, but it would be, like the example above, wrong to conclude that Horton has demonstrated that partial latching occurred.

What is missing in Horton's theory is a means by which to falsify other possible explanations, or an "experiment" by which

---

9. As I previously noted, there is no claim of a manufacturing defect. (Horton Dep. p. 133).

10. It is, of course, true that compliance with applicable safety standards does not preclude a finding of a product defect as a matter of law. *Restatement (Third) Torts: Prod. Liabili-* ty, § 4 (1997). Horton's theory of the defect, however, "[t]hat it will partial [sic] engage and take more than a reasonable amount of poundage to pull it out of partial engagement," is not supported by the results of the first three tests.

Horton's own hypothesis might be falsified. Horton's evidence of partial latching—the lack of physical evidence of any damage or defect in the buckle—is consistent with his theory, but it is also consistent with other possibilities. Perhaps plaintiff caught a piece of clothing in the buckle mechanism; perhaps he inadvertently unfastened the buckle prior to the accident; perhaps he was not wearing the seatbelt at all. The point, of course, is not that any of these occurrences necessarily happened. Rather, Horton's difficulty is that he cannot, by empirical testing, falsify either these possibilities or his own hypothesis. His theory is not susceptible to the "floating iron apple" test, as it were—the empirical evidence that would at least tend to eliminate some of the universe of other possible causes. "Without supporting empirical evidence, hypotheses rarely if ever move outside of the realm of conjecture and speculation." Black, Ayala & Saffran–Brinks, *supra*, at 761.[11]

### 2. Peer Review and Publication

■ Partial engagement of seatbelt buckles has been subject to the requirements of FMVSS 209 for some time, but there is no evidence that Horton's methodology—the insertion method and push-button method—has been subject to peer review or publication. While the lack of peer review is not always dispositive as to admissibility, peer review and scrutiny by the scientific community "increases the likelihood that substantive flaws in methodology will be detected." *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786.

### 3. Potential Error Rate

There are at least two possible sources of error in Horton's tests. In his demon-

stration video, Horton explained that exemplar latchplates became easier to partially latch the more often he tested them. Given this observation, Horton's use of several different buckle mechanisms, most of which were collected from salvage yards, and only one latchplate, for all of his tests may have injected unknown error into the tests.

He also explained that the amount of force required to separate a partially latched buckle varies both from "buckle to buckle" and "partial engagement to partial engagement with the same buckle." (Horton Dep. p. 65). Nonetheless, he tested only six sample buckles. Manipulating each buckle an undisclosed number of times,[12] he achieved partial latch a total of forty-six times and treated those incidents as trials. Solely from the results of those forty-six trials, Horton concluded that all TK52 series buckles, including plaintiff's subject buckle,[13] are defective in design in that they allow partially latching and require an unreasonable amount of force to separate when in a position of partial latch.

While it may be that these potential sources of error could be overcome or explained, were the tests otherwise admissible, plaintiff has not done so. Without such explanation, the "error rate" factor also weighs against admissibility.

### 4. General Acceptance

While partial engagement is referred to in FMVSS 209, there is no proof that Horton's methods are generally accepted. FMVSS 209 requires that testing be done "by means of any technique representative of actual use", and Horton's methods are not so representative.[14]

---

**11.** This lack of testability is also relevant to the lack of "fit" discussed above. Plaintiff's contention is that because Horton can purposefully partially latch the TK52 series buckle, it *could* happen inadvertently, and it *could* have happened in this case. If such speculation can be tested, plaintiff certainly has not done so.

**12.** Horton did not achieve partial latch with the exemplar buckles on every attempt, and

he did not record the number of times he attempted to achieve partial latch and failed. (Horton Dep. p. 91).

**13.** Inexplicably, he has not even attempted to perform his testing on the buckle from Dr. Nemir's driver's seat.

**14.** At oral argument, plaintiff's counsel attempted to distinguish between Horton's test-

For these reasons, I conclude that Horton's testimony is neither reliable nor relevant. Without Horton's testimony, plaintiff cannot produce evidence of his alleged design defect, and summary judgment is therefore warranted.

As an alternative ground for summary judgment, I consider the required substantive elements of plaintiff's claims. I begin by briefly considering the choice of law issue.

## V. CHOICE OF LAW

■ Subject matter jurisdiction is premised upon diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). "It is well-established that federal courts sitting in diversity must apply the choice-of-law rules of the forum state." *Cole v. Mileti,* 133 F.3d 433, 437 (6th Cir.1998), citing *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Charash v. Oberlin College,* 14 F.3d 291, 296 (6th Cir.1994). Michigan courts "apply Michigan law unless a 'rational reason' to do otherwise exists." *Sutherland v. Kennington Truck Service, Ltd.,* 454 Mich. 274, 286, 562 N.W.2d 466 (1997). Where both Michigan and a foreign state have an interest in having its law applied, Michigan courts balance the interests of both states. *Id.*

■ In this case, Maryland has an interest in having its law applied. It is the situs of the car accident. Subsequent to the accident, plaintiff received medical care in a Maryland hospital. He was a resident of Maryland, bought the 1991 Dodge Stealth in Maryland from a Maryland dealer, and registered and insured the car in Maryland. Michigan's interest in applying its law rests solely on its status as the forum state and as the state of incorporation of several of the original defendants. On these facts, I conclude that Maryland law applies.[15]

## VI. DESIGN DEFECT CLAIMS UNDER MARYLAND LAW

■ In *Phipps v. General Motors Corp.,* 278 Md. 337, 363 A.2d 955 (1976), the Maryland Court of Appeals set forth the standard for products liability cases, adopting the *Restatement (Second) of Torts,* § 402A (1965). *Id.,* at 957. "For a seller to be liable under § 402A, the product must be both in a 'defective condition' and 'unreasonably dangerous' at the time that it is placed on the market by the seller." *Id.,* at 959.

■ While the first element—"defective condition"—is relatively straightforward, Maryland courts have developed what is essentially a hybrid system of neg-

ing and his more general testimony as to partial latching. Counsel argued that even were I to find Horton's testing inadmissible under *Daubert,* the balance of Horton's testimony would still be admissible to demonstrate a design defect. As the above analysis has made clear, however, it is not simply Horton's testing that fails under *Daubert.* Plaintiff has failed to demonstrate the relevance of any part of his partial latching hypothesis, and the testability factor of the reliability analysis suggests that Horton's partial latching hypothesis is unreliable as it relates to this case.

I note that plaintiff's attempt to separate Horton's testing from the balance of his testimony also seems inconsistent with Horton's own theory of the design defect. By Horton's own description, the buckle was not allegedly defective simply because it is capable of partially latching—it was allegedly defective be-

cause it took an unreasonable amount of force to separate the buckle once it was in partial latch—thus giving the user the impression that the buckle was fully latched. Without Horton's testing, plaintiff cannot demonstrate this second proposition.

15. The Michigan Court of Appeals has considered similar facts and applied the *Sutherland* framework in *Hall v. General Motors Corp.,* 229 Mich.App. 580, 587, 582 N.W.2d 866 (1998). In *Hall,* the court noted that the plaintiff lived, worked and was injured in the foreign state (North Carolina). The car involved in the accident was owned, registered and insured in the foreign state. The plaintiff also received medical treatment in the foreign state. 229 Mich.App. at 585–86, 582 N.W.2d 866. The court held that Michigan's interest was "minimal," and that North Carolina law should apply. 229 Mich. at 585, 201 N.W. 882.

ligence principles and strict liability as to the second element. In the ordinary case (utilizing negligence principles), the court is required to weigh "the utility of risk inherent in the design against the magnitude of the risk" in order to determine whether plaintiff may recover against the defendant. *Troja v. Black & Decker Manufacturing Co.*, 62 Md.App. 101, 488 A.2d 516, 519 (1985); *Singleton v. International Harvester Co.*, 685 F.2d 112, 115–16 (4th Cir.1981) (applying *Phipps, supra*). Among the factors that should be weighed in this risk-utility analysis are:

(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

(2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

*Troja*, 488 A.2d at 519 (quoting John W. Wade, *On the Nature of Strict Tort Liability for Products*, 44 MISS. L.J. 825, 837–38 (1973)); *Phipps*, 363 A.2d at 959, n. 4.

In order to create a jury issue as to defendants' liability because of defective design, plaintiff is required to produce evidence from which the jury could determine, based on these factors, the unreasonableness of defendants' conduct in manufacturing the product. *Troja*, 488 A.2d at 519. *See also Ziegler v. Kawasaki Heavy Industries, Ltd.*, 74 Md.App. 613, 539 A.2d 701, 705–706 (1988).

■ There is one exception to the use of the risk-utility analysis. In some cases (utilizing something akin to strict liability), where the risk of injury posed by a particular design defect is *"inherently* unreasonable," no balancing test is required. *Troja*, 488 A.2d at 519. The Maryland high court explained in *Phipps:*

However, there are those kinds of conditions which, whether caused by design or manufacture, can never be said to involve a reasonable risk. For example, the steering mechanism of a new automobile should not cause the car to swerve off the road, *Henningsen v. Bloomfield Motors, Inc.*, [ 32 N.J. 358, 161 A.2d 69 (N.J.1960) ]; the drive shaft of a new automobile should not separate from the vehicle when it is driven in a normal manner, *Elmore v. American Motors Corporation*, 70 Cal.2d 578, 75 Cal.Rptr. 652, 451 P.2d 84, 33 A.L.R.3d 406 (1969); the brakes of a new automobile should not suddenly fail, *Sharp v. Chrysler Corporation*, 432 S.W.2d 131 (Tex.Civ.App.1968); and the accelerator of a new automobile should not stick without warning, causing the vehicle suddenly to accelerate. Conditions like these, even if resulting from the design of the products, are defective and unreasonably dangerous without the necessity of weighing and balancing the various factors involved.

*Phipps*, 363 A.2d at 959.

■ Thus, assuming that plaintiff could demonstrate a triable issue of fact as to the first element—the existence of a design defect [16]—it must next be determined

---

16. As I have previously noted, plaintiff has not provided admissible evidence of his theory of design defect. Indeed, the principal shortcoming of plaintiff's proofs is the complete lack of evidence as to the existence of inadvertent partial latching in actual use.

whether strict liability applies or, alternatively, whether plaintiff is required to demonstrate the elements of the risk-utility analysis in order to prevail. Said differently, the question is whether the design defect alleged by plaintiff poses an *"inherently* unreasonable risk." That determination is properly made by the court rather than the jury. *Lundgren v. Ferno–Washington,* 80 Md.App. 522, 565 A.2d 335, 338–39 (1989).

## A. Inherently Unreasonable Risk

■ In the passage of *Phipps* quoted above, the court cited with approval several examples of inherently unreasonable risk—a steering column that caused a car to veer off the road; a driveshaft that separated from a car; brakes in a new car that failed; and an accelerator that stuck. *Phipps,* 363 A.2d at 959. The alleged defect in this case is different in kind from these examples. Plaintiff's theory of the design defect is predicated upon the plaintiff's conduct in either (a) inadvertently failing to fully insert the latchplate into the buckle mechanism despite the fact that there is no impediment, or (b) partially depressing the release button while keeping the latchplate in the buckle mechanism. A design defect premised upon such an unlikely inadvertent misuse of a seatbelt cannot be characterized as inherently unreasonable risk.

Plaintiff suggested in oral argument that a design defect may be established from the fact that plaintiff claims to have been wearing his seatbelt but he was found unrestrained in the back seat of the Stealth. Maryland law does not support this argument. "There can be no products liability recovery in Maryland simply on the *post hoc* conclusion that the mere happening of the accident shows the existence of a defective product." *Stalnaker v. General Motors Corp.,* 934 F.Supp. 179, 180 (D.Md. 1996) (citing *Jensen v. American Motors Corp.,* 50 Md.App. 226, 437 A.2d 242, 245 (1981), *supra* ). *Res ipsa loquitur* does not apply. *Jensen,* 437 A.2d at 245.

Nonetheless, in order to consider defendants' separate contention as to the second element of design defect under Maryland law, I will assume that plaintiff can present a triable issue of fact as to the existence of a design defect.

Whether a risk is inherently unreasonable "involves the consideration of important policy issues... similar to those involved in the application of strict liability for abnormally dangerous activities." *Lundgren,* 565 A.2d at 339 (citing *Restatement (Second) of Torts* § 520 (1977)).[17] Particularly telling are factors (a), "existence of a high degree of risk of some harm to the person, land or chattels of others;" and (c) "inability to eliminate the risk by the exercise of reasonable care." Plaintiff has produced no evidence to suggest that inadvertent partial latching occurs at all in actual use, let alone with a frequency sufficient to suggest that the risk of harm is high; and in all events, it is quite clear that the risk of harm can be completely eliminated if the seatbelt user simply fully latches his or her seatbelt. I conclude, therefore, that the design of the TK52 series buckle does not pose an inherently unreasonable risk under Maryland law.

## B. Risk–Utility Analysis

Because plaintiff's case is "not included in the limited category of inherently unreasonable risk, strict liability, in the usual sense, does not apply." *Singleton,* 685 F.2d at 115. He must alternatively demonstrate that the danger posed by the alleged defect is greater than the utility of

17. The policy considerations listed in § 520 are:

§ 520 ABNORMALLY DANGEROUS ACTIVITIES

In determining whether an activity is abnormally dangerous, the following factors are to be considered:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great; ˙

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to community is outweighed by its dangerous attributes.

the product. This requires that plaintiff present evidence from which a jury could weigh the seven factors of the risk-utility analysis set forth above. Defendants contend that plaintiff has not presented evidence from which a jury could weigh factors (2), (3) and (4). I need address only factor two.[18]

■ The fatal flaw in plaintiff's case, stated throughout this opinion, is that plaintiff simply has not presented any evidence as to the likelihood that inadvertent partial latching might occur in actual use. Without such evidence, a jury would have no means by which to determine the risk or danger posed by the alleged partial latch design defect. This is not to say, as defendants suggest, that plaintiff is required to produce statistical proofs as to the frequency with which inadvertent partial latching occurs in actual use. Here, however, plaintiff has not produced a scintilla of evidence to demonstrate that partial latching occurs except by Horton's purposeful machinations. Were I to admit the entirety of Horton's testimony, the jury would have still have no evidence with which to weigh the "utility of risk inherent in the design against the *magnitude of the risk*." *Troja*, 488 A.2d at 519 (emphasis added).[19]

## VII. FAILURE TO WARN

Plaintiff's remaining claim is that defendants failed to warn him that his seatbelt was partially latched prior to the accident.

His theory is that the dashboard seatbelt light (which lights up when a vehicle is started and turns off when the seatbelt is buckled, if not before) should have been illuminated while his seatbelt buckle was in the alleged condition of partial latch in order to warn plaintiff that his seatbelt was not properly latched.

■ Under Maryland law, the manufacturer of a product may be held liable for failure to warn a plaintiff of a dangerous condition in the product, *Owens–Illinois, Inc. v. Zenobia*, 325 Md. 420, 601 A.2d 633, 641 (1992), provided that the manufacturer either knew or should have known of the danger. *Id.* In order to prevail, however, plaintiff must establish causation between the failure to warn and his injuries. *See, for example, Mazda Motor of Am., Inc. v. Rogowski*, 105 Md.App. 318, 659 A.2d 391, 394 (1995) (noting that concepts of duty, breach, causation and damages are present in both negligent and strict liability failure to warn claims under Maryland law).

■ Plaintiff cannot produce admissible evidence demonstrating that plaintiff's seatbelt buckle was inadvertently partially latched at the time of the accident. Nor can plaintiff himself remember whether the dashboard seatbelt light was on or off. (See Pltf. Brief in Opposition, Ex. 6, Affidavit of Dr. Nemir. "I do not recall the dashboard seat belt warning lamp illuminating at any time during the trip preceding my accident.") Thus, he cannot dem-

18. By addressing only factor two, I do not intend to imply that the absence of proof as to any one factor of the risk-utility analysis will be dispositive in every case. Rather, as the following analysis indicates, because plaintiff fails to provide any evidence as to the likelihood of the alleged risk under factor two, a jury would be unable to balance the other factors—relating mostly to utility of the product and existence of an alternative—against the risk posed by the TK52 series buckle.

19. In an apparent attempt to demonstrate the likelihood that partial latching occurs in actual use, plaintiff requested discovery of literally thousands of documented customer complaints, warranty claims and legal claims involving allegations that TK52 series seatbelt

buckles had failed to latch or remain latched. Plaintiff appears to contend that the sheer magnitude of these complaints suggests that inadvertent partial latching is likely under factor two. Despite the fact that I granted plaintiff considerable deference in his request to review these documents, plaintiff has been unable to present even one case in which partial latching or engagement was identified as the cause of a customer's complaint or injuries. Of the documents submitted for my review, all either specify a cause for the complaint other than partial latching or do not specify any cause for the complaint. These documents are of no probative value as to the likelihood of inadvertent partial latching, nor are they of probative value to plaintiff's accident.

onstrate that his injuries were caused or exacerbated by a failure to warn him of that alleged condition.

Horton's testimony as to the functioning of the switch that controls the dashboard light also demonstrates that plaintiff cannot support his failure to warn theory. Horton tested the electronic switch in the seatbelt mechanism that controls the operation of the dashboard light by connecting the switch to an ohmmeter and noting the point at which the switch turns off the dashboard light. He found that the dashboard seatbelt light turns off "before you reach any kind of latch point," (Horton Dep. p. 193), whether fully latched or partially latched. This testimony suggests, contrary to plaintiff's contentions, that the dashboard light and switch are simply not designed to provide the warning plaintiff would require. Indeed, Horton testified that the dashboard light cannot be designed to provide plaintiff the warning that plaintiff alleges was necessary.

There's no way to fix it [so that the light illuminates when the seatbelt is partially latched] by modifying the switch configuration because the difference in position between latch, fully latched and partially latched is too small to reliably use that so the fix of that is to eliminate the partial engagement possibility. You can't fix it with the switch.

(Horton Dep. p. 194).

Thus, assuming plaintiff could demonstrate causation as to the failure to warn claim, plaintiff's expert establishes that it is not possible for defendants to have given the warning plaintiff claims was required. Defendants are entitled to summary judgment as to the failure to warn claim.

## VIII. CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment are granted.

IT IS SO ORDERED.

## The Takata 52 (TK52) Series Buckle

**The Buckle Mechanism
(or "female end")**

**The Latchplate
(or "male end")**

## The Takata 52 (TK52) Series Buckle

**The Buckle Mechanism**
**(or "female end")**
**(with anchor and wiring visible)**

**The Latchplate**
**(or "male end")**

